1   MICHAEL A. LAURENSON  (SBN: 190023)
    mlaurenson@gordonrees.com
2   GEORGE A. ACERO  (SBN: 226709)
    gacero@gordonrees.com
3   CHRISTIN A. LAWLER  (SBN: 272607)
    clawler@gordonrees.com
4   GORDON & REES LLP
    275 Battery Street, Suite 2000
5   San Francisco, CA 94111
    Telephone:  (415) 986-5900
6   Facsimile:  (415) 986-8054

7   Attorneys for Defendants
    THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and DIANE HUTCHINSON
8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12

13  LORRAINE WELLS, an individual; LISA      )   CASE NO.
    CORDOVA-BAGLEY, an individual;           )
14  ANDREA TUNG, an individual; RON          )   **NOTICE OF REMOVAL OF**
    HARPOLE, an individual; RICHARD          )   **ACTION UNDER 28 U.S.C. § 1441(a)**
15  KEMP, an individual; BRANDON CRAIG,      )
    an individual                            )   **(FEDERAL QUESTION)**
16                                           )
                       Plaintiffs,           )   **Request for Jury Trial**
17                                           )
          vs.                                )
18                                           )
    THE REGENTS OF THE UNIVERSITY OF         )
19  CALIFORNIA, a California public entity;  )
    DIANE HUTCHINSON, an individual; and     )
20  DOES 1-100, inclusive                    )
                                             )
21                     Defendants.           )

22        TO THE CLERK OF THE ABOVE-ENTITLED COURT:

23        PLEASE TAKE NOTICE that Defendants THE REGENTS OF THE UNIVERSITY OF

24  CALIFORNIA and DIANE HUTCHINSON ("Defendants") hereby remove to this Court the

25  state court action described below.

26        1.      On March 17, 2015, an action was commenced in the Superior Court of the State

27  of California in and for the County of Alameda, entitled *Lorraine Wells, et al. v. The Regents of*

28

                              -1-

1    *the University of California, et al.*, Case No. RG 15762714. A copy of the summons and

2    complaint are attached hereto as **Exhibit A.**

3        2.     Defendants first received a copy of said complaint on March 18, 2015.

4    Accordingly, this Notice is timely under 28 U.S.C. § 1446(b).

5        3.     This action is a civil action of which this Court has original jurisdiction under 28

6    U.S.C. § 1331, and is one which may be removed to this Court by Defendants pursuant to the

7    provisions of 28 U.S.C. § 1441(a) in that it arises under federal law pursuant to 42 U.S.C. §

8    1981, *et seq.*; 42 U.S.C. § 1983, *et seq.*; 42 U.S.C. § 1985, *et seq.* and 29 U.S.C. § 621, *et seq.*

9    This Court has supplemental jurisdiction over Plaintiffs' state law claims, pursuant to 28 U.S.C.

10   § 1367(a), as these claims arise out of the same case or controversy. Defendants request a jury

11   trial.

12       4.     All of the named Defendants consent to this removal.

13       5.     Removal to the San Francisco Division of the United States District Court for the

14   Northern District of California is appropriate because the removed state court action was filed in

15   the Superior Court of California, County of Alameda.

16       6.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal, without

17   exhibits, will promptly be served on Plaintiffs' counsel.

18       7.     A copy of this Notice of Removal, without exhibits, will also be filed with the

19   Clerk of the Superior Court of the State of California in and for the County of Alameda.

20   Dated: 4|15|15

21                       GORDON & REES LLP

22                       By: _____

23                         Michael A. Laurenson
                           George A. Acero
                           Christin A. Lawler

24                         *Attorneys for Defendants*

25                         THE REGENTS OF THE
                           UNIVERSITY OF

26                         CALIFORNIA and DIANE
                           HUTCHINSON

27

28

*Gordon & Rees LLP*
*275 Battery Street, Suite 2000*
*San Francisco, CA 94111*

1097659/23101214v.1

# EXHIBIT A

03/17/2015   16:16   510-465-8689          FEDEX OFFICE     5604          PAGE   03

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Regents of the University of California, a California public entity; Diane
Hutchinson, an individual; and Does 1-100, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Lorraine Wells, an individual; Lisa Cordova-Bagley, an individual;
Andrew Tung, an individual; Ron Harpole, an individual, Richard Kemp,
an individual, Brandon Craig, an individual

| FOR COURT USE ONLY |
|---|
| *(SOLO PARA USO DE LA CORTE)* |
| **ENDORSED FILED ALAMEDA COUNTY** |
| MAR 17 2015 |
| CLERK OF THE SUPERIOR COURT |
| By   Xian-Xii Bowie |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: |
|---|---|
| *(El nombre y dirección de la corte es):* Superior Court of California, County of Alameda, Oakland Division. Rene C. Davidson Courthouse, 1225 Fallon Street, Oakland, CA 94612 | *(Número del Caso):*  RG 15 7 6 2 7 1 4 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Na'il Benjamin, Esq. 101 California Street, Ste., 2710, San Francisco, CA 94111. 415.633.8833

| DATE: March 17, 2015 | Clerk, by | Xian-Xii Bowie | , Deputy |
|---|---|---|---|
| *(Fecha)*   Leah Wilson | *(Secretario)* | | *(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)

☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | SUMMONS | Page 1 of 1 Code of Civil Procedure §§ 412.20, 465 www.courtinfo.ca.gov |
|---|---|---|

1 NA'IL BENJAMIN, ESQ., (SBN 240354)
BENJAMIN LAW GROUP
2 101 California Street, Suite 2710
San Francisco, California 94111
3 Telephone: (415) 633.8833
Facsimile: (415) 349.3334
4 nbenjamin@benjaminlawgroup.com

5 Attorneys for Plaintiffs
LORRAINE WELLS, LISA CORDOVA,
6 ANDREA TUNG, RON HARPOLE,
RICHARD KEMP, and BRANDON CRAIG

7

**ENDORSED
FILED**
ALAMEDA COUNTY

MAR 17 2015

CLERK OF THE SUPERIOR COURT
By _____ Xian-Xii Bowie

8 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 **IN AND FOR THE COUNTY OF ALAMEDA**

10 **OAKLAND DIVISION**

| | |
|---|---|
| 11 LORRAINE WELLS, an individual; LISA CORDOVA-BAGLEY, an individual; ANDREA TUNG, an individual; RON HARPOLE, an individual; RICHARD KEMP, an individual, BRANDON CRAIG, an individual | CASE NO.: RG 15762714 |

COMPLAINT FOR:

14
15 Plaintiff,

16 v.

17 REGENTS OF THE UNIVERSITY OF
CALIFORNIA, a California public entity;
18 DIANE HUTCHINSON, an individual; and
DOES 1 - 100, inclusive,

19 Defendants.

1. **RACE DISCRIMINATION IN VIOLATION OF FEHA (RACE);**
2. **HARASSMENT IN VIOLATION OF FEHA (RACE);**
3. **RETALIATION IN VIOLATION OF FEHA (RACE);**
4. **DISCRIMINATION IN VIOLATION OF FEHA (AGE);**
5. **HARASSMENT IN VIOLATION OF FEHA (AGE);**
6. **RETALIATION IN VIOLATION OF FEHA (AGE);**
7. **42 U.S.C §1981 (RACE);**
8. **42 U.S.C § 1983 (RACE);**
9. **42 U.S.C §1985 (RACE);**
10. **42 U.S.C §1981 (AGE);**
11. **42 U.S.C § 1983 (AGE);**
12. **42 U.S.C §1985 (AGE);**
13. **ADEA ACT OF 1967;**
14. **NEGLIGENT TRAINING AND SUPERVISION;**
15. **INTENTIONAL INFLICATION OF EMOTIONAL DISTRESS**

**DEMAND FOR JURY TRIAL**

26
27
28

-1-

COMPLAINT FOR DAMAGES                                   CASE NO. _____

**FILED BY FAX**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|

Na'il Benjamin, Esq. (SBN 240354)    nbenjamin@benjaminlawgroup.com
Benjamin Law Group
101 California Street, Suite 2710
San Francisco, CA 94111
TELEPHONE NO: 415.633.8833    FAX NO: 415.349.3334
ATTORNEY FOR *(Name)*: Plaintiffs Lorraine Wells, et al.

**ENDORSED
FILED
ALAMEDA COUNTY**

MAR 17 2015

CLERK OF THE SUPERIOR COURT
By ___Xian-Xii Bowie___

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: Rene C. Davidson Courthouse
MAILING ADDRESS: 1225 Fallon Street,
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Oakland

CASE NAME:
Wells, et al. v. Regents of the University of California, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | RG15762714 |
| | | | JUDGE: | |
| | | | DEPT: | |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☑ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☑ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☑ punitive

4. Number of causes of action *(specify)*: 15. Race, Harassment, Retaliation, FEHA, Negligence, Emotional Distress

5. This case ☐ is ☑ is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March ___, 2015

_____          ▶ _Na'il Benjamin (...)_
(TYPE OR PRINT NAME)          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]
**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

**FILED BY FAX**

03/17/2015 16:16 510-465-8689 FEDEX OFFICE 5604 PAGE 04

1 NA'IL BENJAMIN, ESQ., (SBN 240354)
BENJAMIN LAW GROUP
2 101 California Street, Suite 2710
San Francisco, California 94111
3 Telephone: (415) 633.8833
Facsimile: (415) 349.3334
4 nbenjamin@benjaminlawgroup.com

5 Attorneys for Plaintiffs
LORRAINE WELLS, LISA CORDOVA,
6 ANDREA TUNG, RON HARPOLE,
RICHARD KEMP, and BRANDON CRAIG
7

**ENDORSED
FILED
ALAMEDA COUNTY**

MAR 17 2015

CLERK OF THE SUPERIOR COURT
By____Xian-Xii Bowie____

8             **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                **IN AND FOR THE COUNTY OF ALAMEDA**

10                         **OAKLAND DIVISION**

11 LORRAINE WELLS, an individual; LISA      ) CASE NO.: RG15762714
CORDOVA-BAGLEY, an individual;            )
12 ANDREA TUNG, an individual; RON          ) **COMPLAINT FOR:**
HARPOLE, an individual; RICHARD KEMP,     )
13 an individual, BRANDON CRAIG, an         )    1. **RACE DISCRIMINATION IN**
individual                                )       **VIOLATION OF FEHA (RACE);**
14                                          )    2. **HARASSMENT IN VIOLATION**
                                           )       **OF FEHA (RACE);**
15              Plaintiff,                  )    3. **RETALIATION IN VIOLATION**
                                           )       **OF FEHA (RACE);**
16      v.                                  )    4. **DISCRIMINATION IN**
                                           )       **VIOLATION OF FEHA (AGE);**
17 REGENTS OF THE UNIVERSITY OF             )    5. **HARASSMENT IN VIOLATION**
CALIFORNIA, a California public entity;    )       **OF FEHA (AGE);**
18 DIANE HUTCHINSON, an individual; and     )    6. **RETALIATION IN VIOLATION**
DOES 1 - 100, inclusive,                   )       **OF FEHA (AGE);**
19                                          )    7. **42 U.S.C §1981 (RACE);**
              Defendants.                   )    8. **42 U.S.C. § 1983 (RACE);**
20                                          )    9. **42 U.S.C. §1985 (RACE);**
                                                10. **42 U.S.C §1981 (AGE);**
21                                              11. **42 U.S.C. § 1983 (AGE);**
                                                12. **42 U.S.C. §1985 (AGE);**
22                                              13. **ADEA ACT OF 1967;**
                                                14. **NEGLIGENT TRAINING AND**
23                                                 **SUPERVISION;**
                                                15. **INTENTIONAL INFLICATION**
24                                                 **OF EMOTIONAL DISTRESS**
25
                                                **DEMAND FOR JURY TRIAL**
26 _____
27
28

**FILED BY FAX**

-1-

COMPLAINT FOR DAMAGES                                   CASE NO. _____

Plaintiff LORRAINE WELLS, et al, complains and pleads as follows:

## GENERAL ALLEGATIONS

1.    At all relevant times, Plaintiffs LORRAINE WELLS, LISA CORDOVA-BAGLEY, ANDREA TUNG, RON HARPOLE, RICHARD KEMP, and BRANDON CRAIG ("Plaintiffs"), lived and/or worked at the Lawrence Berkeley National Laboratory, in the County of Alameda, State of California.

2.    At all relevant times, Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA ("Defendants" or "UC Regents") was and now is a public entity organized and existing under the laws of the State of California, with its principal place of business located at 1111 Franklin Street, 12th Floor, Oakland, CA 94607.  UC Regents operates, manages, and/or owns the Lawrence Berkeley National Laboratory, and thereby employs the people that work there.

3.    At all relevant times, Defendant DIANE HUTCHINSON ("Hutchinson") was and now is an individual residing in, or working in, the County of Alameda, State of California, and committed actions within, and outside the scope of her job duties and employment at the Lawrence Berkeley National Laboratory.

4.    Plaintiffs are informed and believe and based thereon alleges that each Defendant was the agent and employee of its Co-Defendants, and in doing some of the things alleged in this Complaint was acting within the course and scope of that agency and employment.

5.    The true names and capacities of Defendants sued herein as Does 1 through 100, inclusive, are unknown to Plaintiff, but Plaintiff will amend this Complaint when and if the true names of said Defendants become known to them.  Plaintiffs are informed and believe and based thereon allege that each of the Defendants sued herein as a Doe is responsible in some manner for the events and happenings herein set forth and proximately caused injury and damages, and any reference to "Defendant" shall mean "Defendant and each of them."

## BACKGROUND

6.    Numerous Lawrence Berkeley National Laboratory ("Lab") employees can and will provide declarations, deposition testimony, and trial testimony, establishing that the new regime under Kim Williams enacted practices and procedures intended to harass employees that were over

-2-

the age of 40 and/or at enjoying enough years of service to reach certain levels of vesting in their pensions. Kim Williams and Becky Cornett acted with the intent to harass Plaintiffs and force them to quit. They also acted with the intent of building a case for termination against these employees, and in some instances, forced employees to resign in response to the threat of termination. To the extent that these practices and policies included conduct that was not intentional, such conduct is still actionable under the ADEA, and had a disparate impact under Title VII and FEHA.

7.     Lab employees can provide admissible evidence establishing that the conduct of Williams, Cornett, and their mid-level managers, was willful, extreme and outrageous, and outside of the ambit of the Worker's Compensation Act. Indeed, in addition to being extreme and outrageous, some employees were targeted with considerations of their age and race fueling the managers' attacks and harmful conduct.

8.     Moreover, these managers – seemingly at Williams's direction – engaged in a conspiracy to terrorize the employees that they wanted to get rid of. They colluded in managers' meetings, they discussed their plans in person as well as emails, they applauded when they accomplished certain aspects of their mission, and they sought to punish anyone that broke rank and deviated from their master plan.

9.     Accordingly, Plaintiffs' have claims for Intentional Infliction of Emotional Distress and age-based harassment. Plaintiff Lorraine Wells has race-based claims under the same federal and state statutes. Plaintiffs also have claims under *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, for negligent training and supervision. Lastly, the Plaintiffs that are former employees have claims under the 5th and 14th Amendments for deprivation of procedural due process, and fraudulent inducement to enter contract (Terry Pierre).

10.     UC Regents and its pension problems became a well-told story during the recent economic downturn. The Regents's contribution to the pension system increased to 14%. And then it returned to requiring significant contributions for its employees. Even still, the funding shortfall was enormous. UC Regents borrowed billions of dollars, including a recent $700 million loan.

-3-

11.     Last year, UC Retirement had only 76 percent of the actuarially projected assets needed to pay pension obligations over the next three decades.  So in addition to being incapable of satisfying its pension obligations to the hard working employees that had already served their time and become completely vested, the Regents had the growing problem of dealing with current employees that would be vesting and eligible for retirement in the upcoming years.

12.     The Lab's pension and lifetime benefits system is tiered.  Many of the employees under the OCFO are subject to a vesting schedule that requires 10 years of service to earn 50% lifetime medical, and 20 years of service to earn 100% lifetime medical.  Given the existing inability to pay its current pension obligations, the Regents's problems were increasing every day an employee vested and grew closer to retirement.  Therefore, the only control the Regents had to solve its problem was to reduce the number of employees that would vest and/or reach retirement while employed for the Regents.

13.     After borrowing billions of dollars to bridge the pension funding gap, and as the economy began to recover, the Lab hired Kim Williams as the CFO of the Office of the CFO for Procurement and Property ("OCFO").  Kim Williams, in concert with her direct report Becky Cornett, devised a plan to reduce the number of older employees, and vesting employees, in the department.  This plan, in their minds, served several purposes: (1) the department could hire new employees that could possibly retire with less years of service and therefore drain less of the pension's resources; (2) they could hire new employees for less than six months and then terminate them before they became permanent employees (this was especially true for employees that were newly hired and over 40); and (3) this plan also enabled them to hire managers that would act in furtherance of their scheme and remain loyal to their mission.

14.     Williams and Cornett were not focused only on cleansing part of their department of older and more tenured employees.  They were also focused on power and control.  They executed both plans in a manner that struck fear in the Lab employees, and created frustration and resentment.  These emotions multiplied as Lab employees learned that there was no place for them to turn to for help, support, or protection, because Human Resources ignored complaints and even reported them to Williams and Cornett.

-4-

15.     As a part of their master plan, Williams and Cornett controlled the Human Resources process and function so that employees that complained met dead ends and ultimately faced the reality that Williams was in control and calling the shots. Rainey Wells's experience is a perfect example of this well-played scheme.

16.     Fortunately for Wells and her peers, there were two managers in the OCFO named Gary Mack ("Mack") and Richard Kemp ("Kemp"). These managers reported to Becky Cornett, and they were peers to Diane Hutchinson, Laura Crosby, Colleen Lewis, and Edna Annis.

17.     Mack and Kemp sat in the same meetings as Cornett's other direct reports, and they received the same instructions from Cornett with respect to Williams's and Cornett's scheme to force older and longer-tenured employees to quit. This process is sometimes referred to as "managing out" employees.

18.     Craig Hopkins is a Lab employee over 40 years old that reported to Mack. Hopkins, like the other Plaintiffs, worked for the Lab long enough to vest his pension, but not long enough to reach his next vesting level or age of retirement. Mack, as Hopkins's manager, received orders from Cornett to push Hopkins out by overloading him with work, refusing to provide him with training, giving him unfair performance reviews, refusing to approve him for raises, and taking other steps to make Hopkins's life miserable so that he would quit.

19.     In an act of heroism, Mack had the character and gumption to refuse to go along with Cornett's orders. Mack asked why Hopkins could not be trained like other newer employees that did not have enough years of service to vest in their pensions. Mack told Cornett and his peers that he refused to mistreat Hopkins and play their games. Mack resigned from his position because he did not want to work in an environment where managers were intentionally harassing older employees so that they would quit. Mack was also fed up with the hostility he experienced from OCFO management for speaking up and protecting Hopkins.

20.     After Mack resigned, Kemp followed. But before Kemp resigned, he exposed the Williams/Cornett conspiracy by reporting their misconduct to the Lab's whistleblower program, as well as confirming for specific employees that the Lab was targeting them and intentionally harassing them.

-5-

COMPLAINT FOR DAMAGES

CASE NO. _____

21.     For example, Kemp drafted a multi-page email to several employees describing how Lab managers discussed methods for harassing older Lab employees.

22.     Kemp sent this email before he left the Lab, but after he started to experience tension, ostracism, and coldness following his attempts to rectify the indignities experienced by Lab employees at the hands of Williams and Cornett.

23.     Kemp did not initially understand what Cornett was up to when he began working at the Lab.  In fact, in response to concerns raised by Williams regarding pension costs, he had presented her with a strategic plan requiring the targeting and intentional hiring of employees that were under 40 and less experienced.  Kemp will confirm that Williams and Cornett absolutely loved his plan and found ways to implement it.

24.     Kemp did not envision that anyone would intentionally alienate older employees and force them to quit, but once he figured out what Cornett was up to, he began defending some of these older employees during management meetings

25.     Kemp asked to train Wells and Pierre, but Cornett refused to allow him to do so. Kemp spoke with other employees about his concerns and started to learn about the hit list that had been created for employees that were over 40 years old and that were being "targeted" by OCFO management.

26.     Kemp challenged comments that were made unfairly about older employees and addressed the inequities in the feedback and criticism that was being made about Wells, Pierre, and others.

27.     At one point, following one of the meetings where Kemp defended an employee that was on the OFCO hit list, and spoke critically about one of the favored employees, Cornett warned him about speaking badly of favored employees and being so defensive on behalf of targeted employees.  On a different occasion, an OCFO manager suggested to Kemp that he should not forget about the ways in which OCFO management chastises and targets people that do not go along with the program.

28.     Kemp was well-aware of the methods and tactics employed by the Lab's upper management once on the hit list.  But Kemp was not deterred.  He continued to speak up about his

-6-

1    concerns and speak with other Lab employees about his observations.

2          29.    Not surprisingly, Kemp soon realized that because of his actions on behalf of

3    targeted employees, he had become a target as well.  He experienced the evil looks, cold shoulder,

4    and an overall icy environment because of the way Cornett and the other OCFO managers reacted

5    to his presence.

6          30.    They stopped accepting his feedback, they stopped coming to his office to speak

7    with him, they stopped seeking his opinion, they had meetings without him, and they made him

8    feel unwanted and like he was no longer a part of the management team.

9          31.    Kemp saw the writing on the wall and he was starting to experience severe

10   dissatisfaction and sadness at work.  The environment weighed heavily on him and he began to

11   experience sleeplessness and anxiety because of how he was being treated and what he knew was

12   happening to innocent longtime Lab employees.

13         32.    Kemp's anxiety increased significantly, and he could not continue to allow OCFO

14   management to mistreat him for speaking up, and mistreat Lab employees that were committed to

15   the Lab's mission and relying on the Lab for their livelihood.

16         33.    So Kemp resigned before they could fire him or break him, and he "blew the

17   whistle" be writing emails to some employees on the OCFO hit list and to the Lab's whistleblower

18   hotline.

19         34.    In his emails, Kemp explained that:

20         •    Managers inequitably distributed work and overloaded targeted employees with

21              work so that they made mistakes and could then be written up;

22         •    Managers commented that "it is hard to get an employee out of the lab,

23              especially if they are a certain age, so we load them up with work to make it

24              uncomfortable for them to stay.";

25         •    He had been told specifically that certain employees were targeted for

26              elimination, and they were not to help them nor train them.  He was specifically

27              told to keep his employees from helping/training targeted employees although

28              his employees were allowed to spend huge chunks of time training younger

-7-

1    and/or newer employees;

2       &bull;  He presented a quote directly from manager Diane Hutchinson on April 29,

3          2014: "we got rid of Terry Pierre, but we still have two more to go, Rainie and

4          Lisa." We will just keep dinging them until we can get them out of here.  Kemp

5          was referring to plaintiffs Lorraine Wells and Lisa Cordova;

6       &bull;  He presented a quote directly from manager Laura Crosby, a manager to whom

7          Diane Hutchinson reports, stating: "We still have to get Rainie out of here, but it

8          is difficult as she played the race card.  Also her age.  We just need to keep

9          hitting her performance as it is hard for us to touch her.  Lisa Cordova also will

10        be hard to get out of here due to her age, so will have to find another way."  This

11        statement was made around April 2, 2014;

12      &bull;  He presented another quote from manager Laura Crosby which she made on

13        March 4, 2014: "We are going to try and get Rainie and Lisa out of here by

14        keeping them on a performance plan, as Becky is going to try and have a layoff

15        and if we can keep them on a Performance Plan we can get rid of them and not

16        have to deal with a Performance Plan or deal with other issues.";

17      &bull;  He presented another quote from manager Diane Hutchinson on April 28, 2014:

18        "I can't touch Lisa Cordoba due to her age, so to get around it I am going to try

19        and move her to the PCard department on the Hill and then maybe she will go";

20      &bull;  Kemp explained that he asked managers Laura Crosby and Diane Hutchinson

21        several times about performance plans and trainings for specific employees, and

22        each time they responded that they are just trying to get the employees out.  He

23        explained that he was directed not to allow Shanna Wells, a stellar employee

24        tasked with training others, to train targeted employees, but that Shanna Wells

25        provided quite a bit of training to Dan McCloskey and others.  Terry Pierre,

26        Lorraine Wells, and Lisa Cordoba were singled out and excluded from being

27        trained.

28    35.    He explained that he could state with complete confidence that performance plans

-8-

1  were not intended to improve employee performance or used to establish training needs. The only

2  use of the performance plans was to get targeted employees out.

3     36.     Plaintiff Wells is one of the employees that Kemp emailed and confessed to before

4  resigning. He also reported these concerns to the Lab's Whistleblower unit, the Department of

5  Energy, and other internal organizations related to the Lab.

6     37.     Wells, like several other Plaintiffs, worked in the Procurement division led by

7  Williams and Cornett. Wells is over 40 years old, has 22 years of procurement experience and has

8  worked at the Lab for almost eight years. She reports to Diane Hutchinson, one of Cornett's direct

9  reports. Before working under Williams, Cornett, and Hutchinson, Wells had good performance

10 reviews, she had never been written up or placed on a performance plan, and she was in good

11 standing as a Lab employee. Upon reaching her 10th anniversary, she would be entitled to her

12 previously vested pension, plus 50% of her medical, dental, vision, and life insurance benefits.

13    38.     As part of Williams's and Cornett's plan to target Wells for termination or a forced

14 resignation, they overloaded her with work, scrutinized her on a regular basis, criticized her

15 performance, refused to provide her with support or training, and then gave her a poor performance

16 review resulting in her being placed on a performance improvement plan. According to

17 Hutchinson, Wells's direct manger, Wells was to remain on this plan indefinitely!

18    39.     Wells complained to Human Resources about the unfair treatment she was

19 experiencing. In July 2013, Wells wrote an 8 page complaint outlining in great detail the

20 disrespect and harassment that Hutchinson subject her to. She explained that Hutchinson harassed

21 her based on age and race and violated Regulations and Procedures Manual Rules 2.01. She

22 explained that she was disciplined for seeking feedback and clarification about certain ambiguities,

23 she described the condescending and demeaning tone in which Hutchinson communicated with

24 her, Wells identified times when Hutchinson ignored her and her accomplishments and minimized

25 her existence, and she explained the unevenness in which Hutchinson criticized her work but

26 ignored similar shortcomings from people more directly responsible for errors.

27    40.     In August 2013, Wells submitted another written complaint and explained that

28 "[t]he antagonistic, aggressive and hostile conditions I'm being subjected to in my working

-9-

1 environment, as a result of Diane's actions, [they] are impeding my ability to adequately focus and

2 get my work done. It is an intimidating, oppressive atmosphere, for me, that is being generated by

3 my manager." She also explained that Hutchinson was retaliating against her for complaining, and

4 that Hutchinson threatened to discipline her if she asked her questions about her job duties.

5 Notably, the questions Wells wanted to ask were about the so-called poor performance that led to

6 Wells being placed on a trumped-up performance plan.

7       41.      Wells continued to explain that Hutchinson spoke to her in a condescending tone,

8 made her feel disliked and worthless, nitpicked her work and offered unfair and inconsistent

9 criticism, devalued and sometimes ignored her achievements while openly celebrating and posting

10 similar achievements of Wells's coworkers, ignores compliments and appreciation about Wells

11 from Wells's customers but exaggerates and chastises Wells about small misunderstandings, and

12 blamed Wells for mistakes that were not caught by people responsible for reviewing and catching

13 mistakes.

14       42.      Wells also explained that she informed Hutchinson of an injury that was causing her

15 severe pain and discomfort. Wells previously informed Hutchinson that her injury and pain

16 impacted her work, the amount of time she needed to complete her work, and that she was

17 significantly limited in her abilities to perform at times when the pain was severe. At no time did

18 Hutchinson offer to accommodate Wells or otherwise initiate a good faith interactive process. Nor

19 did Human Resources respond to this complaint from Wells. Instead, Hutchinson – at the approval

20 of Human Resources – expected Wells to work longer hours and to perform her job duties without

21 any accommodation at all. Accordingly, Hutchinson continued to scrutinize Wells, ding her

22 performance, nitpick her work product, send inaccurate and condescending emails, mischaracterize

23 Wells's performance and circumstances, require her to sit in performance-based meetings on a

24 weekly basis, and continuously hint and suggest that Wells was subject to termination for reasons

25 that did not fairly reflect Wells's performance.

26       43.      Wells did not try to hide the fact that she complained about the way she was being

27 treated. Although she did not have the evidence from Kemp at the time of her initial complaints,

28 she has been consistent in her descriptions of the mistreatment and venom she endured at work.

-10-

44.     Other employees, however, relied heavily on their complaints being confidential. Lab employees in the procurement department are extremely fearful of retaliation.  Many of them would file reports only under the most extreme circumstances.  These employees have seen their colleagues pushed out of jobs, fired, and marginalized for filing complaints.

45.     Their concerns are legitimate.  When Lab employees filed complaints with the Inspector General, Neda Bustler and Hahn Kent began questioning people and searching for information that would reveal the names of the employees that complained to the Inspector General so that they could report those names to Williams and her direct reports.  In fact, during a staff meeting, Bustler took over a section of that meeting and began to lecture everyone about filing complaints to the Inspector General about the Lab's unlawful conduct.  Kemp describes her as asking everyone to tell her the names of the people that were "calling out labor ethics violations to whistleblower programs."  Wells was believed to be one of these people.

46.     Given the behavior of Williams and her regime, it is understandable that these co-conspirators would want to sniff-out whistleblowers and scare people against filing reports.

47.     Notably, however, Williams and Cornett did not need spies to inform them of the names of complaining employees.  Human Resources violated employee confidentiality and updated Williams on complaints raised by employees.  On one occasion, after Wells complained to Human Resources about the way Hutchinson was mistreating her, Williams responded to Wells's complaint.  Human Resources, on the other hand, did not.  Instead, Human Resources sent the Complaint to Williams and allowed Williams to dismiss Wells's complaint and defend Hutchinson.  This conduct almost completely chilled any further complaints of other employees once they realized that they had no place to turn for protection of help from the tyranny of Williams and Cornett.

48.     Surprisingly, after Kemp resigned, "blew the whistle," and told employees about the harassment scheme employed by Williams and Cornett, the Lab purported to conduct an investigation into the allegations of harassment, retaliation and discrimination by hiring an attorney to conduct the investigation.  This investigator reviewed documents where Kemp provided great detail – including names and dates – about managers discussing harassing employees and their

-11-

1  intent to push them out.

2      49.    This investigator confirmed that Mr. Mack resigned from his Lab position because

3  he refused to participate in harassing one of his direct reports.

4      50.    The investigator could also confirm that Wells and her former colleague, Terry

5  Pierre, were overloaded with work because they have been disproportionately assigned

6  reimbursements so they would make mistakes and give managers reasons to write them up and

7  provide poor performance evaluations.

8      51.    This investigator had proof that Cornett and her minions cheered loudly when

9  Cornett reported they had successfully forced Pierre to quit after being harassed beyond his

10 capacity.  She had Wells's complaints about Hutchinson, Williams's unusual response to Wells

11 about Wells's complaint to Human Resources, and she spoke with at least one former procurement

12 manager that confirmed Cornett's spiteful and vindictive behavior, as well her direction to

13 management not to train Wells, Cordova, Pierre, and other employees that fit into the protected

14 classes addressed in this lawsuit.

15     52.    This investigator ignored all of this evidence, and accepted the words of Hutchinson

16 and Crosby.  Notably, Hutchinson and Crosby are the same two managers that Kemp reported to

17 the Department of Energy ("DOE") as directing a subordinate to falsify documents in response to a

18 DOE audit.  Apparently, the Lab could not pass its PERT audit on its merit.  So Crosby and

19 Hutchinson bullied a terrified direct report into falsifying records and presenting them to the DOE

20 as if they were true and accurate copies of the responsive documents.

21     53.    The investigator ignored all of this evidence and concluded that the allegations of

22 harassment were unfounded.  Notably, these types of conclusions at the Lab or quite common

23 when investigators hired by the Lab perform the investigation.  The Lab's investigation process

24 serves only the Lab's litigation interests and has historically empowered managers to continue their

25 harassing behavior without any concerns for consequences for their conduct.

26     54.    These one-sided investigations also tell employees that it is pointless for them to

27 complain and expect the Lab to take action.  Consequently, employees are both deterred and

28 scared.  Wells was neither.  However, the Lab ultimately terminated Wells without ever fully

-12-

COMPLAINT FOR DAMAGES                                      CASE NO. _____

1    investigating her complaints or protecting her from ongoing and future discrimination, retaliation,

2    and harassment.

3         55.     Consistent with the Lab's message is management's actions following the favorable

4    investigations.  Cornett sent an email to rank and file procurement personnel boasting that the

5    investigation concluded that management was not liable for any of its harassing conduct.

6    Accordingly, Cornett and her co-conspirators picked up where they left off and continued to harass

7    Wells and anyone that stood against them.

8         56.     Ronald Harpole was over 40 years old when he began working at the lab on October

9    15, 2012, as a Senior Subcontracts Administrator.  Dianne Hutchinson was his manager.

10        57.     Mr. Harpole witnessed Gary Mack being harassed by the predominantly female

11   management team (Williams, Cornett, Hutchinson, Crosby, etc.).  He also overheard Hutchinson

12   and others state that Rainey Wells, Lisa Cordova, and Terry Pierre were on the hit list and

13   "targeted" during a meeting with managers and supervisors.  He also had first hand experience with

14   the wrath of Cornett with respect to people that complained about harassment and mistreatment in

15   the workplace.

16        58.     On February 14, 2013, Mr. Harpole performed an assignment with the Real Estate

17   team.  Mr. Harpole visited the Richmond office space with Diane Hutchinson.  During their visit,

18   Hutchinson received a phone call from Becky Cornett.  Hutchinson eyed Mr. Harpole suspiciously

19   while she spoke on the phone.  When Hutchinson ended the call she immediately turned to Mr.

20   Harpole and told him that Becky said for him to "button the top button of his shirt everyday and

21   shut up!"  Mr. Harpole felt harassed and intimidated by the comment and literally followed the

22   instruction by keeping his top shirt buttoned while at work.

23        59.     In addition to his role on the Real Estate team, Mr. Harpole was responsible for

24   several contracts, his priorities being the Lab Security, Fire Suppression Review, and

25   Transportation.  Becky Cornett assigned Mr. Harpole to additional group projects that included

26   reformatting of all Lab documentation and the preparing twenty desktop practice guides.  Mr.

27   Harpole worked more than ten hours a day in the office and two hours in the evening from home to

28   complete his work assignments.

-13-

COMPLAINT FOR DAMAGES                                                    CASE NO. _____

60.     Mr. Harpole was given a performance review after three months of employment.  At that time, Mr. Harpole became aware of his probationary status.  The only feedback he received with respect to needing to improve was that he should continue to improve his understanding of the purchase order software, which he subsequently did.

61.     On March 3, 2013, Mr. Harpole was assigned to a training team along with a supervisor names Colleen Lewis.  He participated in the training sessions and completed the training homework.  At one point, he made a diagram at the request of the group which Ms. Jorgenson praised, but which Ms. Lewis rejected without reason.  On two separate occasions, Ms. Lewis called Mr. Harpole out in the meeting in front of his colleagues telling him that he "didn't know what he was talking about" and that he "didn't add value to the team."  Mr. Harpole had evidence of his stellar work product and the support of colleagues who considered him to be a knowledgeable contributor to the training group.

62.     On March 20, 2013, Mr. Harpole went to Hutchinson to formally report Ms. Lewis for the harassment that he experienced in the team meetings and concerns he had about comments that were made about Ms. Wells, Ms. Cordova, and Mr. Pierre.  On April 3, 2013, two weeks before his probationary period was to end, Mr. Harpole was fired.

63.     Andrea Tung is over 40 years old, and was hired as the Business Assurance Administrator in the Lab procurement department on September 3, 2013.  She had five years of prior experience working for the Regents, yet she was required to observe a new six month probationary period when she was hired.  When she observed harassment towards Terry Pierre, Lorraine Wells, Lisa Cordova, and others, Ms. Tung commented on these observations to other co-workers.  It became generally known and understood that Ms. Tung was not on board with the conspiracy by Williams and Cornett with respect to older employees.  Consequently, Ms. Tung was given work assignments in addition to her regular workload as a disguised attempt to cause her failure during her probationary period.

64.     Ms. Tung's outspoken behavior caused her immediate supervisor, Edna Annis, to disregard and ignore Ms. Tung's strong work performance.  Annis assigned Ms. Tung increasingly complicated work tasks but did not provide her with additional support or training.  Ms. Tung

-14-

1   never received any indication, feedback, or notice that she had failed to perform her duties until the

2   final month of her probationary period.

3         65.    It wasn't until Ms. Tungs's verbal performance review by Edna Annis on February

4   4, 2014, that Ms. Tung received any negative feedback on her job performance.  Annis began to

5   cryptically ask and suggest that Ms. Tung was unhappy and that Ms. Tung may not want to

6   continue at the Lab.  Those were not Ms. Tung's thoughts or words.  But for some strange reason,

7   Annis began to create that as her storyline with respect to Ms. Tung.

8         66.    Ms. Tung knew something was strange about Annis's conduct and the comments she

9   was making.  Ms. Tung asked Annis if she was going to still have a job.  Annis ignored the

10  question and did not provide a straight answer.  On February 18, 2014, Ms. Tung was asked to sign

11  a written copy of her review, but was never provided a copy.  On February 25, 2014, Edna Annis

12  informed Ms. Tung that she would not be extended a permanent position.

13        67.    Edna Annis's treatment of Andrea Tung is indicative of the managerial practice of

14  mistreating qualified and capable employees.  Andrea Tung had over five years vested as a

15  University of California employee prior to her employment at the Lab.  Had she obtained

16  permanent employment with the Lab, her pension would have increased.  As a probationary

17  employee, she became susceptible to unfair termination because of her outspoken observations of

18  harassment towards other co-workers.  Consequently, Andrea Tung became a target of the same

19  conspiracy that she criticized.

20        68.    Lisa Cordova is over 40 years old and has been employed at the Lab for almost 28

21  years.  She currently works under Williams and Cornett and was managed by Defendant

22  Hutchinson.  In fact, she worked with Ms. Wells.  Their offices are across from each other and

23  observed each others working conditions.  Ms. Wells and Ms. Cordova often communicated with

24  each other and compared notes about how they were treated at work.

25        69.    Ms. Cordova began performing procurement duties in connection with the OCFO

26  before Williams took control of that office.  At that time, Jeffrey Fernandez was the CFO, and Gary

27  Mack was Ms. Cordova's supervisor.  Ms. Cordova worked under Mr. Mack for almost nine (9)

28  months handling procurement duties and received compliments and positive feedback about her

-15-

1  performance.  His performance review for Ms. Cordova was that she met expectations

2      70.    David Chen became Ms. Cordova's supervisor after Mr. Mack.  Mr. Chen evaluated

3  Ms. Cordova's work during that time and provided her with a performance review.  He felt that her

4  performance exceeded expectations.

5      71.    Laura Crosby became Ms. Cordova's supervisor after Mr. Chen.  Ms. Crosby

6  evaluated Ms. Cordova's work during that time period and provided her with a performance review.

7  She felt that Ms. Cordova's performance met expectations.

8      72.    Kim Williams became the CFO while Ms. Cordova was supervised by Ms. Crosby.

9  Shortly after Williams took over, Defendant Hutchinson became Ms. Cordova's supervisor.  At this

10  time, as described above, Williams and Cornett were decision-makers in the OCFO.

11      73.    Shortly after reporting to Hutchinson, Ms. Cordova observed unfair and inequitable

12  treatment from Hutchinson.  Hutchinson would not respond to her inquiries, Hutchinson would not

13  provide collegial feedback as a supervisor, Hutchinson often made comments that it was not her

14  job to "train" or give information, and she would essentially remove herself from the environment

15  as a resource to Ms. Cordova and Ms. Wells.

16      74.    Hutchinson would then criticize Ms. Cordova's work and scrutinize her performance

17  in a manner that did not fairly reflect the task and circumstances at issue.  She would harp on small

18  areas for improvement and completely minimize all of the positive feedback and achievements that

19  had been highlighted by vendors and colleagues.  Hutchinson rode Ms. Cordova's back as if Ms.

20  Cordova's performance was limited only to the negative things that Hutchinson chose to focus on.

21      75.    Hutchinson started giving Ms. Cordova negative performance reviews.  Ms.

22  Cordova had previously received raises while working under Mr. Mack and Mr. Chen.  But once

23  Hutchinson became her supervisor, the raises stopped.  Ms. Cordova has not received a raise while

24  working under Hutchinson, Cornett and Williams.

25      76.    Ms. Cordova began to experience severe emotional distress due to the undue age-

26  based harassment.  She also experienced actual work-related injuries resulting from a fall at work

27  and the physical performance of her job duties.  Accordingly, Ms. Cordova missed work due to

28  doctor's appointments and was perceived as someone that had a disability.

COMPLAINT FOR DAMAGES                                                    CASE NO. _____

77.     Williams, Cornett and Hutchinson included Ms. Cordova on the list of those that they would not train. Ms. Cordova continued to receive unfair scrutiny, while younger and less-tenured employees were given training and opportunities to improve and advance.

78.     Brandon Craig ("Mr. Craig") was the Lead Subcontracts Administrator of the Service Center who witnessed and challenged the unfair treatment experienced by his direct employees Eileen Yokoi ("Yokoi") and Denny Parra ("Parra") who were both over 40 years of age. Craig attended various one on one and group meetings with managers where the underlying topics of discussion revolved around how to force older employees to leave and replace them with younger, less expensive workers.

79.     Craig was specifically ordered by Colleen Lewis to say and do things to fellow employees that he believed were unfair. Specifically, Craig was asked to require Yokoi to document all of her activities down to the minute for two weeks. Craig was also told not to extend Deborah Haddens' temporary employment contract despite the fact that their group was substantially overworked. Craig considered these activities to be consistent with Cornett's desire to harass older employees into self-imposed resignation.

80.     Because Craig refused to participate in the harassment of targeted employees as ordered by Colleen Lewis, Craig became a target himself. In fact, following a promotion, Cornett refused to properly classify Craig's position as an F28.2 Lead Manager, for which he would earn more money.

81.     Additionally, Craig had raised concerns with Cornett, in confidence, about his observations. Cornett did not keep his complaints confidential. Instead, she shared his concerns with other managers and made it clear that he was no going to go along with their program.

82.     Craig's opposition to targeting employees rendered him a target as well. Rather than wait for any manufactured pretenses for his termination, Craig chose to resign.

## FIRST CAUSE OF ACTION

## RACE AND DISABILITY DISCRIMINATION (FEHA)

### (Wells Against the Lab)

83.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 82,

-17-

1 inclusive, of this Complaint as though fully set forth herein.

2      84.     As a proximate result of the wrongful conduct of Defendants, Plaintiff has sustained

3 substantial losses in earnings and other employment benefits in an amount according to proof at the

4 time of trial. As a further proximate result of the wrongful conduct of Defendants, Plaintiff has

5 suffered and continues to suffer humiliation, embarrassment, emotional distress and mental

6 anguish, all to her damage in an amount according to proof at the time of trial

7      85.     In doing the acts herein alleged, Defendants acted with oppression, fraud, malice,

8 and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive

9 damages in an amount according to proof at the time of trial

10      86.     Plaintiff is entitled to costs and reasonable attorney's fees pursuant to Government

11 Code Section 12965(b)

12                            **SECOND CAUSE OF ACTION**

13        **RACE AND DISABILITY HARASSMENT IN VIOLATION OF FEHA**

14                  **(Wells Against all Defendants)**

15      87.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 86,

16 inclusive, of this Complaint as though fully set forth herein.

17      88.     During the course of Plaintiff's employment, Defendants failed to prevent sexual

18 harassment towards Plaintiff in violation of Government Code section 12940(k). Defendants

19 committed unlawful employment practices in violation of Government Code sections 12940 et seq.

20 by failing to prevent the above-alleged acts of sexual harassment and retaliation and by wholly

21 failing to undertake any prompt and adequate investigation concerning Defendants' unlawful

22 conduct, and by failing to take any action in response to the unlawful conduct of Defendants.

23      89.     As a proximate result of the wrongful conduct of Defendants, Plaintiff has sustained

24 substantial losses in earnings and other employment benefits in an amount according to proof. As

25 a further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and

26 continues to suffer humiliation, embarrassment, emotional distress and mental anguish, all to

27 his/her damage in an amount according to proof.

28      90.     In doing the acts herein alleged, Defendants acted with oppression, fraud, malice,

-18-

COMPLAINT FOR DAMAGES                                     CASE NO. _____

1  and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive

2  damages in an amount according to proof at the time of trial.

3      91.    Plaintiff is entitled to costs and reasonable attorney's fees pursuant to Government

4  Code Section 12965(b).

### THIRD CAUSE OF ACTION

### RETALIATION

### (Wells Against the Lab)

8      92.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 91,

9  inclusive, of this Complaint as though fully set forth herein.

10      93.    Based on the above-alleged conduct, Defendants retaliated against Plaintiff for

11  opposing and reporting race, age, and disability-related harassment.

12      94.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered

13  special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount

14  according to proof.  As a further direct and proximate result of Defendants' conduct, Plaintiff will

15  suffer additional special damages in the form of lost future earnings, benefits and/or other

16  prospective damages in an amount according to proof.

17      95.    As a further proximate result of the wrongful conduct of Defendants, Plaintiff has

18  suffered and continues to suffer humiliation, lack of self-confidence, embarrassment, emotional

19  distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

20      96.    In doing the acts herein alleged, Defendants acted with oppression, fraud, malice,

21  and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive

22  damages in an amount according to proof.  Plaintiff is entitled to costs and reasonable attorney's

23  fees pursuant to Government Code Section 12965(b).

### FOURTH CAUSE OF ACTION

### AGE DISCRIMINATION (FEHA)

### (Wells, Cordova, Harpole, Tung Against all Defendants)

27      97.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 96,

28  inclusive, of this Complaint as though fully set forth herein.

-19-

98.    As a proximate result of the wrongful conduct of Defendants, Plaintiffs have sustained substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.  As a further proximate result of the wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer humiliation, embarrassment, emotional distress and mental anguish, all to her damage in an amount according to proof at the time of trial

99.    In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiffs, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial

100.    Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to Government Code Section 12965(b)

### FIFTH CAUSE OF ACTION

### AGE HARASSMENT IN VIOLATION OF FEHA

#### (All Plaintiffs Against all Defendants)

101.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 100, inclusive, of this Complaint as though fully set forth herein.

102.    During the course of Plaintiffs' employment, Defendants failed to prevent harassment towards Plaintiffs in violation of Government Code section 12940(k).  Defendants committed unlawful employment practices in violation of Government Code sections 12940 et seq. by failing to prevent the above-alleged acts of harassment and retaliation and by wholly failing to undertake any prompt and adequate investigation concerning Defendants' unlawful conduct, and by failing to take any action in response to the unlawful conduct of Defendants.

103.    As a proximate result of the wrongful conduct of Defendants, Plaintiffs have sustained substantial losses in earnings and other employment benefits in an amount according to proof.  As a further proximate result of the wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer humiliation, embarrassment, emotional distress and mental anguish, all to their damage in an amount according to proof.

104.    In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiffs, and Plaintiffs are therefore entitled to

-20-

1  punitive damages in an amount according to proof at the time of trial.

2       105.    Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to

3  Government Code Section 12965(b).

4  **SIXTH CAUSE OF ACTION**

5  **RETALIATION**

6  **(All Plaintiffs Against the Lab)**

7       106.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 105,

8  inclusive, of this Complaint as though fully set forth herein.

9       107.    Based on the above-alleged conduct, Defendants retaliated against Plaintiffs for

10  opposing and reporting unlawful harassment.

11       108.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered

12  special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount

13  according to proof.  As a further direct and proximate result of Defendants' conduct, Plaintiffs will

14  suffer additional special damages in the form of lost future earnings, benefits and/or other

15  prospective damages in an amount according to proof.

16       109.    As a further proximate result of the wrongful conduct of Defendants, Plaintiffs have

17  suffered and continue to suffer humiliation, lack of self-confidence, embarrassment, emotional

18  distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

19       110.    In doing the acts herein alleged, Defendants acted with oppression, fraud, malice,

20  and in the conscious disregard of the rights of Plaintiffs, and Plaintiffs are therefore entitled to

21  punitive damages in an amount according to proof.  Plaintiffs are entitled to costs and reasonable

22  attorney's fees pursuant to Government Code Section 12965(b).

23  **SEVENTH CAUSE OF ACTION**

24  **42 U.S.C. § 1981**

25  **(Race and Disability Discrimination)**

26  **(Wells)**

27       Plaintiffs incorporate paragraphs 1 through 110, inclusive, by reference as though set forth

28  in full below.

-21-

111.    Defendants have acted under the color of state law and violated Plaintiff's contractual rights, privileges and immunities protected under the Constitution of the United States. This includes the Fourteenth Amendment's right to equal protection.

112.    By doing the things described above, Defendants harassed, retaliated against, and discriminated against Plaintiff Wells on the basis of her race, age and disability.

113.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof at trial.  As a further direct and proximate result of Defendants' conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at trial.

114.    As a further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and continues to suffer humiliation, lack of self-confidence, embarrassment, emotional distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

115.    In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages in an amount according to proof at the time of trial.  Plaintiff is entitled to costs and reasonable attorney's fees pursuant to the statutes referenced herein.

116.    This deprivation of rights, as alleged above and incorporated herein, including the rights as women to equal protection under the laws of the United States, gives rise to a claim under 42 U.S.C. § 1981.

### EIGHTH CAUSE OF ACTION

#### 42 U.S.C. § 1983

#### (Race and Disability Harassment Against All Defendants)

#### (Wells)

Plaintiffs incorporate paragraphs 1 through 116, inclusive, by reference as though set forth in full below.

117.    Defendants have acted under the color of state law and violated Plaintiffs' rights, privileges and immunities protected under the Constitution of the United States.  This includes the

-22-

CASE NO. _____

1   Fourteenth Amendment's right to equal protection.

2        118.   By doing the things described above, Defendants harassed, retaliated against, and

3   discriminated against Plaintiff Wells on the basis of her race and disability.

4        119.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered

5   special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount

6   according to proof at trial.  As a further direct and proximate result of Defendants' conduct,

7   Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or

8   other prospective damages in an amount according to proof at trial.

9        120.   As a further proximate result of the wrongful conduct of Defendants, Plaintiff has

10  suffered and continues to suffer humiliation, lack of self-confidence, embarrassment, emotional

11  distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

12       121.   In doing the acts herein alleged, Defendants acted with oppression, fraud, malice,

13  and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive

14  damages in an amount according to proof at the time of trial.  Plaintiff is entitled to costs and

15  reasonable attorney's fees pursuant to the statutes referenced herein.

16       122.   This deprivation of rights, as alleged above and incorporated herein, including the

17  rights as women to equal protection under the laws of the United States, gives rise to a claim under

18  42 U.S.C. § 1983.

19                      **NINTH CAUSE OF ACTION**

20                          **42 U.S.C. § 1985**

21         **(Race and Disability Discrimination and Harassment)**

22                       **(Wells)**

23       Plaintiffs incorporate paragraphs 1 through 122, inclusive, by reference as though set forth

24  in full below.

25       123.   Defendants have acted in concert under the color of state law and violated Plaintiffs'

26  rights, privileges and immunities protected under the Constitution of the United States.  This

27  includes the Fourteenth Amendment's right to equal protection.

28       124.   By doing the things described above, Defendants harassed, retaliated against, and

-23-

COMPLAINT FOR DAMAGES                       CASE NO. _____

1  discriminated against Plaintiff Wells on the basis of her race and disability.

2     125. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered

3  special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount

4  according to proof at trial.  As a further direct and proximate result of Defendants' conduct,

5  Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or

6  other prospective damages in an amount according to proof at trial.

7     126. As a further proximate result of the wrongful conduct of Defendants, Plaintiff has

8  suffered and continues to suffer humiliation, lack of self-confidence, embarrassment, emotional

9  distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

10     127. In doing the acts herein alleged, Defendants acted with oppression, fraud, malice,

11  and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive

12  damages in an amount according to proof at the time of trial.  Plaintiff is entitled to costs and

13  reasonable attorney's fees pursuant to the statutes referenced herein.

14     128. This deprivation of rights, as alleged above and incorporated herein, including the

15  rights as women to equal protection under the laws of the United States, gives rise to a claim under

16  42 U.S.C. § 1985.

## TENTH CAUSE OF ACTION

### 42 U.S.C. § 1981

### (Age Harassment, Discrimination and Retaliation)

### (All Plaintiffs Against all Defendants)

21    Plaintiffs incorporate paragraphs 1 through 128, inclusive, by reference as though set forth

22  in full below.

23     129. Defendants have acted under the color of state law and violated Plaintiffs'

24  contractual rights, privileges and immunities protected under the Constitution of the United States.

25  This includes the Fourteenth Amendment's right to equal protection.

26     130. By doing the things described above, Defendants harassed, retaliated against, and

27  discriminated against all Plaintiffs on the basis of their age and protected activity.

28     131. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered

-24-

special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof at trial.  As a further direct and proximate result of Defendants' conduct, Plaintiffs will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at trial.

132.    As a further proximate result of the wrongful conduct of Defendants, Plaintiffs have suffered and continues to suffer humiliation, lack of self-confidence, embarrassment, emotional distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

133.    In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiffs, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.  Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to the statutes referenced herein.

134.    This deprivation of rights, as alleged above and incorporated herein, including the rights as employees older than the age of 40 to equal protection under the laws of the United States, gives rise to a claim under 42 U.S.C. § 1981.

## ELEVENTH CAUSE OF ACTION

### 42 U.S.C. § 1983

#### (Age Harassment, Discrimination and Retaliation)

#### (All Plaintiffs Against All Defendants)

Plaintiffs incorporate paragraphs 1 through 134, inclusive, by reference as though set forth in full below.

135.    Defendants have acted under the color of state law and violated Plaintiffs' rights, privileges and immunities protected under the Constitution of the United States.  This includes the Fourteenth Amendment's right to equal protection.

136.    By doing the things described above, Defendants harassed, retaliated against, and discriminated against all Plaintiffs on the basis of their age and protected activity.

137.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof at trial.  As a further direct and proximate result of Defendants' conduct,

-25-

COMPLAINT FOR DAMAGES                                                    CASE NO. _____

1  Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or

2  other prospective damages in an amount according to proof at trial.

3        138.    As a further proximate result of the wrongful conduct of Defendants, Plaintiffs have

4  suffered and continues to suffer humiliation, lack of self-confidence, embarrassment, emotional

5  distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

6        139.    In doing the acts herein alleged, Defendants acted with oppression, fraud, malice,

7  and in the conscious disregard of the rights of Plaintiffs, and Plaintiffs are therefore entitled to

8  punitive damages in an amount according to proof at the time of trial.  Plaintiffs are entitled to

9  costs and reasonable attorney's fees pursuant to the statutes referenced herein.

10        140.    This deprivation of rights, as alleged above and incorporated herein, including the

11  rights as women to equal protection under the laws of the United States, gives rise to a claim under

12  42 U.S.C. § 1983.

## TWELFTH CAUSE OF ACTION

### 42 U.S.C. § 1985

### (Age Harassment, Discrimination and Retaliation)

### (All Plaintiffs Against all Defendants)

17      Plaintiffs incorporate paragraphs 1 through 140, inclusive, by reference as though set forth

18  in full below.

19        141.    Defendants have acted in concert under the color of state law and violated Plaintiffs'

20  rights, privileges and immunities protected under the Constitution of the United States.  This

21  includes the Fourteenth Amendment's right to equal protection.

22        142.    By doing the things described above, Defendants harassed, retaliated against, and

23  discriminated against all Plaintiffs on the basis of their age and protected activity.

24        143.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered

25  special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount

26  according to proof at trial.  As a further direct and proximate result of Defendants' conduct,

27  Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or

28  other prospective damages in an amount according to proof at trial.

COMPLAINT FOR DAMAGES                                   CASE NO. _____

144.    As a further proximate result of the wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer humiliation, lack of self-confidence, embarrassment, emotional distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

145.    In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiffs, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.  Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to the statutes referenced herein.

146.    This deprivation of rights, as alleged above and incorporated herein, including the rights as women to equal protection under the laws of the United States, gives rise to a claim under 42 U.S.C. § 1985.

## THIRTEENTH CAUSE OF ACTION

## FAILURE/NEGLIGENT TRAINING AND SUPERVISION

### (All Plaintiffs Against All the Lab)

Plaintiffs incorporate paragraphs 1 through 146, inclusive, by reference as though set forth in full below.

147.    As alleged above, the Lab had a deliberate indifference to the rights of its employees, failed to properly train its managers and supervisors, and intentionally ignored the harassing and hurtful conduct of its managers and supervisors.

## FOURTEENTH CAUSE OF ACTION

### (Retaliation in Violation of the First Amendment)

### (All Plaintiffs Against All Defendants)

Plaintiffs incorporate paragraphs 1 through 147, inclusive, by reference as though set forth in full below.

148.    As alleged above, Plaintiffs complained about their experiences at the Lab as well as the observations of other co-workers being mistreated.

149.    As a result, Plaintiffs were punished with increased work, ostracism, mean treatment, and termination.

///

-27-

COMPLAINT FOR DAMAGES                                              CASE NO. _____

## FIFTEENTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against all Defendants)

### (All Plaintiffs Against All Defendants)

150.   Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 149, inclusive, of this Complaint as though fully set forth herein.

151.   The conduct of Defendants as set forth above was so extreme and outrageous that it exceeded the boundaries of a decent society and lies outside the compensation bargain.  Said conduct was intended to cause Plaintiffs severe emotional distress, or was done in conscious disregard of the probability of causing severe emotional distress.  Said conduct was also in direct violation of California public policy.

152.   As a proximate result of the wrongful conduct of Defendants, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof.

153.   As a further proximate result of the wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer humiliation, lack of self-confidence, embarrassment, emotional distress and mental anguish, all to his damage in an amount according to proof.

154.   In doing the acts herein alleged, Defendants acted with oppression, fraud, malice and in conscious disregard of the rights of Plaintiffs, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants, and each of them, according to proof, as follows:

a.   For general and special damages, including lost wages, in a sum in excess of the minimum jurisdictional limit of this Court, according to proof at trial;

b.   For interest at the maximum legal rate;

c.   For punitive damages;

-28-

d.    For reasonable attorney's fees;

e.    For costs of suit incurred herein; and

h.    For such other and further relief as the Court may deem just and proper.

DATED: March 15, 2015

BENJAMIN LAW GROUP

By:    /s/ Na'il Benjamin
NA'IL BENJAMIN
Attorney for Plaintiff
LORRAINE WELLS, et al.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on the claims so triable.

DATED: March 15, 2015

BENJAMIN LAW GROUP

By:    /s/ Na'il Benjamin
NA'IL BENJAMIN
Attorney for Plaintiffs
LORRAINE WELLS, et al.

-29-

COMPLAINT FOR DAMAGES                                    CASE NO. _____